FILED '09 JAN 15 11:33 USDC-ORE

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| JACLYN S. RICHARDS, | ) | |
| | ) | |
| Plaintiff, | ) | CV 07-1056-TC |
| | ) | |
| v. | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| MICHAEL J. ASTRUE, Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |

COFFIN, Magistrate Judge:

Plaintiff Jaclyn Richards challenges the Commissioner's decision denying her applications

for disability insurance benefits and supplemental security income payments under Titles II and XVI

of the Social Security Act.  The court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c).  The

Commissioner's decision should be affirmed.

The court reviews the Commissioner's decision to ensure that proper legal standards were

applied and the findings are supported by substantial evidence in the record.  42 U.S.C. § 405(g);

1 - FINDINGS AND RECOMMENDATION

*Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). The administrative law judge ("ALJ") applied the five-step sequential disability determination process set forth in 20 C.F.R. §§ 404.1520 and 416.920. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). He reached the conclusion at step two of the process that Richards has no medically determinable impairments that significantly diminish her ability to perform basic work-related activities.

Richards contends the ALJ improperly found she engaged in substantial gainful activity. She challenges the ALJ's conclusion that she has no severe impairments. She contends the ALJ improperly rejected her subjective statements and those of her mother.

I.    **Substantial Gainful Activity**

At step one of the sequential disability determination process, an ALJ must find the claimant not disabled if the claimant is engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b); *Bowen v. Yuckert*, 482 US 137, 140 (1987). The ALJ found Richards worked part-time with earnings that did not reach the level which presumptively shows substantial gainful activity. 20 C.F.R. §§ 404.1574, 416.974. Concurrently, Richards attended graduate level classes on a full time basis at Portland State University. The ALJ found Richards had engaged in substantial gainful activity based on these combined activities. Admin. R. 16.

Gainful work activity is work activity done for pay or profit. It includes work activity done without pay or profit if it is the kind of work that is usually done for pay or profit. 20 C.F.R. §§ 404.1572(b), 416.972(b). School attendance is not usually done for pay or profit and is not considered gainful work activity. 20 C.F.R. §§ 404.1572(c), 416.1572(c). The ALJ's step one finding cannot be affirmed.

## II.    Severe Impairments

Despite his adverse finding at step one, the ALJ continued the sequential evaluation and made additional alternative findings at step two.  At step two of the decision-making sequence, a claimant must show she has any combination of medically determinable impairments that significantly limits her ability to perform basic work activities.  If she cannot meet this burden, the ALJ must find her not disabled and need not complete the remaining steps in the decision-making sequence. 20 C.F.R. §§ 404.1520(c), 416.920(c); SSR 85-28, 1985 WL 56856 *3; *Yuckert,* 482 U.S. at 146.

The step two determination requires a careful evaluation of the medical findings that describe the claimant's alleged impairments and an assessment of the claimant's subjective statements regarding the resulting limitations and restrictions, provided the medical evidence establishes impairments that could reasonably be expected to produce such limitations and restrictions.  SSR 96-3p, 1996 WL 374181 *2.

### A.    Medical Evidence

The ALJ concluded the medical findings, progress notes, and physicians' opinions did not support Richards's allegations of multiple impairments and instead reflected persistent exaggeration of her health problems.  A careful review of the medical records supports this conclusion.

Richards alleges her disability is a consequence of two motor vehicle accidents.  In February 2002, she was restrained by seatbelts in a collision that did not deploy her airbags or leave seatbelt imprints on her skin.  She did not have head trauma or lose consciousness.  Clinical testing for radiculopathy was negative.  X-rays of the cervical spine showed the vertebrae in proper alignment and the disc spaces without abnormalities.  There was no evidence of fracture, soft tissue edema, or

degenerative changes. X-rays of the left shoulder showed no fracture, dislocation, arthritic change, or soft tissue calcification. Admin. R. 435-37. Despite the absence of medical findings, Richards required narcotic pain medication and obtained a cervical collar, although medical personnel advised her this was not necessary or helpful. Richards insisted she was completely disabled and adamantly maintained she could not return to work. *Id.* at 410-11, 415, 419-20, 424. Although she claimed extreme pain and inability to move during examination, she seemed to move well in the examination room at other times. *Id.* at 419-20.

In May 2002, before she felt she had recovered sufficiently to return to work, Richards was involved in a side-swipe accident. *Id.* at 173. She reported subjective pain in the neck, back, and left shoulder. X-rays of the cervical, thoracic, and lumbar spine were negative. Richards could ambulate well and was discharged in good condition with a diagnosis of strained muscles in the affected areas. *Id.* at 402-05. Richards insisted she could not perform range of motion exercises. She continued to use a cervical collar, arm splints, and narcotic pain medication. *Id.* at 389. Elizabeth Klein, M.D., noted Richards could not raise her arms for a range of motion test during examination, but was able to do the same motion when putting her hands behind her head while lying on the examination table. *Id.* at 377-80. Richards demonstrated "an obvious pain behavior overlay" in a neurophysiology examination which produced no signs of neurologic injury. *Id.* at 173.

In June 2002, Richards reported symptoms of depression and post traumatic stress disorder ("PTSD"), but refused antidepressant therapy. *Id.* at 352-53, 364-66, 368, 377-80. She began counseling with Scott Losk, Ph.D. In Dr. Losk's evaluation, Richards's mood was euthymic and she exhibited the full range of affect without outward signs of emotional distress. Her responses on the Beck Depression inventory suggested only mild depression. *Id.* at 508-10.

In August 2002, Richards obtained MRI scans of her spine.  The scans showed mild degenerative changes in the cervical spine without any significant disc bulge or herniation or significant canal or foraminal compromise.  *Id.* at 966.  The lumbar scans were normal in signal and appearance except mild degeneration at one vertebral space with a disc bulge that did not have any impact on neural elements.  *Id.* at 967.

Richards began to complain of unusual trance-like episodes she called "blackouts" which lasted about two minutes. These involved confusion and memory loss, but not loss of consciousness. She underwent extensive evaluations and Dr. Klein noted "Multiple new issues seem to come up with each visit." *Id.* at 352-53.  Dr. Klein did not believe Richards's unusual symptoms could be related to her motor vehicle accidents.  *Id.* at 347-48.

In September 2002, an echocardiogram revealed mildly reduced systolic function with an ejection fraction at or slightly below the low borderline for normal function. *Id.* at 945.  A 24-hour Holter monitor revealed nothing that would explain her unusual symptoms.  *Id.* at 943.  A followup electrocardiogram ("ECG") was normal. *Id.* at 339.  Her blood chemistry values were normal.  *Id.* at 941-42.  MRI scans of the brain were normal and an electroencephalogram ("EEG") was negative for seizure activity.  *Id.* at 347-50.  Clinically, Dr. Klein observed very mild paraspinous muscle spasms, but Richards remained subjectively hypersensitive to any touch.  *Id.* at 347-48.

In December 2002, Richards was evaluated by Steven Anderson, M.D., a rehabilitation medicine specialist.  He found no particular point tenderness on palpation.  Richards prevented proper evaluation of the paraspinous soft tissues and accurate range of motion measures by guarding behavior even with superficial palpation.  She demonstrated non-organic pain behavior, including widespread superficial tenderness, inconsistency in pain reproduction, inconsistency in straight-leg-

raise test results, and ratchety giveway weakness. She had no sensory deficit and her reflexes were normal. *Id.* at 665-67.

Dr. Anderson found nothing that would preclude Richards from resuming normal activities. *Id.* Likewise, Dr. Klein repeatedly urged Richards to enroll in vocational rehabilitation, begin a serious exercise program, and resume normal activities. *Id.* at 287-89, 296, 301, 306-08, 310-12. Richards adamantly maintained she was completely disabled.

In February 2003, Richards was seen in the emergency room for chest discomfort and reported a recent diagnosis of dilated cardiomyopathy. Her examination was essentially normal without signs of cardiac or pulmonary pathology. Richards had normal diagnostic imaging of the chest and a normal ECG. *Id.* at 298-300, 505-07. Richards later told Dr. Klein her cardiologist believed she would need a heart transplant. Dr. Klein found no clinical reason to believe Richards had cardiac pathology. *Id.* at 287-89.

In April 2003, Richards began seeing Navnit Kaur, M.D., a pain management specialist. She claimed chronic pain, cardiomyopathy, diabetes, and seizures. Dr. Kaur found limited range of motion in the low back and neck and obtained a positive straight-leg-raise test result. Richards's muscle strength was undiminished. Dr. Kaur planned to wean Richards from her pain medications and administered a series of caudal epidural steroid injections. *Id.* at 604-07.

Within a few days of Dr. Kaur's evaluation, Truman Lorish, M.D., a physical medicine and rehabilitation specialist, examined Richards and obtained generally normal results. Richards had full neuromuscular strength in the back, with only giveway weakness and general tenderness. Unlike Dr. Kaur, Dr. Lorish obtained negative straight-leg-raise test results and found Richards's ranges of motion within the functional range. Although Richards asserted she had fibromyalgia, Dr. Lorish

did not agree, stating she had no chronic condition. *Id.* at 583-85. Similarly, the medical evidence did not fully support the diagnoses Richards had asserted to Dr. Kaur. Metabolic studies did not support her claimed diagnosis of diabetes. EEG studies did not reflect seizure activity. As noted many times in the record, her cardiomyopathy involved low normal systolic function and remained stable during the period under review. Numerous references reflect that many of her medical providers believed she overstated her pain symptoms.

In September 2003, Richards was seen in the emergency room for squeezing chest pain which began along with left ear symptoms while she swam in the ocean in Hawaii. She again reported a history of cardiomyopathy and mentioned plans for a transplant. A chest x-ray was within normal limits. Laboratory tests, an ECG, and a CT pulmonary angiogram were all normal. *Id.* at 527, 568-69, 594-95.

In February 2004, Kim Webster, M.D., performed a consultative physical examination. Richards told Dr. Webster she had fibromyalgia, pain in the neck, low back, and both shoulders, PTSD, and cardiomyopathy. Dr. Webster noted clear signs of exaggeration. Richards gave poor effort and endorsed unusual symptoms without "rhyme or reason". For example, Richards could not touch her finger to her nose, although she had no pathology that would cause this limitation. Richards walked with an exaggerated antalgic gait when asked to perform a gait test, but seemed to walk normally at other times. In the examination room, Richards did all movements in a slow laborious way. She exhibited extreme pain behavior when doing straight-leg-raises, but had no pain when doing the equivalent movement under the guise of a knee examination. Richards demonstrated extreme tenderness to minimal palpation. She gave "extraordinarily poor effort" when performing strength tests, but had normal muscle bulk and tone without evidence of atrophy. Dr. Webster

opined there was no evidence of any significant musculoskeletal impairment and remarked that Richards's pain behavior markedly exceeded the objective findings. *Id.* at 531-35.

James Bryan, Ph.D., performed a consultative psychodiagnostic evaluation. He found no apparent depression or anxiety, but opined a somatoform-related process exacerbated Richards's subjective distress and resulted in overstatement of her physical complaints and PTSD symptoms, all of which Richards perceived to be complications from the two motor vehicle accidents in 2002. *Id.* at 536-42. Richards said she could not do household chores due to pain, but admitted she was enrolled in a full time master's degree program at Portland State University, reported boogie-boarding and snorkeling in Hawaii, and competed in pool tournaments. *Id.* at 537-38

In March 2004, Richards had an initial evaluation by Wai Lee, M.D. Richards claimed she had been diagnosed with fibromyalgia in the past and reported a strong family history of osteoarthritis and rheumatoid arthritis. Dr. Lee found no sign of arthritis, but found Richards's ranges of motion limited by subjective pain. Dr. Lee noted prominent tenderness to palpation at all 18 fibromyalgia trigger points, but did not mention control point testing. A complete blood count, metabolic panel and blood tests for pathology markers were negative. Diagnostic images of the shoulder, hips, pelvis, and lumbar spine were normal. Dr. Lee concluded "without metabolic or mechanical issues to explain her pain, we are most probably dealing with fibromyalgia." *Id.* at 612, 615-20, 700. Richards told Dr. Lee she continued to follow her normal activity routine, including full-time graduate school, despite her symptoms.

In June 2004, Mural Nishikawa, M.D., examined Richards and all findings were within normal limits. Richards had no spinal point tenderness, but had generalized tenderness in the paraspinous muscles of the lumbar region. Dr. Nishikawa opined that Richards's reported

fibromyalgia and PTSD appeared stable without current problems. *Id.* at 676. Dr. Nishikawa ordered a repeat echocardiogram which was essentially normal except for mildly decreased systolic function consistent with earlier findings. *Id.* at 767-68.

Richards was examined by cardiologist Jody Welborn, M.D., in August 2004. Richards's reported her diagnosis of cardiomyopathy and symptoms of occasional chest discomfort with exertion and intermittent palpitations. Richards said she became short of breath and her fingernail beds turned blue while sitting at a high level in the San Diego Padres baseball stadium. Dr. Welborn ordered a heart monitor to correlate Richards's subjective palpitations with her actual cardiac function. The results on the monitor were often not congruent with Richards's subjective experience of intensified heart beat and chest discomfort. A thallium stress test demonstrated normal overall left ventricular function and normal myocardial perfusion. Dr. Welborn obtained a repeat ECG which showed mildly decreased left ventricle function with an ejection fraction at or slightly below the borderline for normal function. Dr. Welborn believed Richards's chest discomfort was non-cardiac, but thought Richards should be on a beta blocker due to intermittent episodes of elevated heart rate. In December 2004, during final examinations for her graduate program, Richards denied chest pain, shortness of breath, elevated heart rate, palpitations, dizziness, or syncope. *Id.* at 1000-05, 1011-13.

In January 2005, Richards experienced a "conscious black out" episode and then went out for the evening to play pool. While playing pool, she fainted and was transported to the hospital. She reported shortness of breath but had normal oxygen saturation. Her physical examination was normal. Heart monitoring was unremarkable. Richards had no tenderness in any region of the spine. A CT scan of the head was negative. Hematology and blood chemistry values were normal, except

a mildly elevated Troponin value. *Id.* at 697, 861-63, 870-71, 876-77. Richards reported a similar episode in February 2005 and returned to the emergency room. Medical staff noted a history of heart monitoring without event, normal physical and neurological examinations, and the absence of objective evidence of injury where Richards reported pain. *Id.* at 746-48.

In March 2005, Richards returned to the emergency room with confusion and fever after a pool party at the beach. Medical staff ordered a CT of her head, which was unremarkable. An ECG obtained during Richards's experience of subjective chest pain was completely normal. A full metabolic panel was also normal. Fluids obtained through a lumbar puncture were normal. The only abnormality noted was another mildly elevated Troponin value which was consistent with past readings and thought to be insignificant. *Id.* at 696, 840-42, 847-48. In April 2005, Richards had another ECG which was essentially normal. *Id.* at 988.

In May 2005, Richards returned to the emergency room complaining of acute back pain radiating down her right leg. X-rays of the lumbar spine were unremarkable for degeneration or signs of pathology. *Id.* at 829-30, 835. In June 2005, she returned to the emergency room with another complaint of new back pain radiating down both legs. There were no abnormal neurologic findings on examination. *Id.* at 822-23.

In June 2005, Dr. Welborn obtained no abnormal findings on physical examination and observed no functional deficits. Richards had a normal thallium stress test. She wore a King of Hearts monitor to record heart function when she felt subjective symptoms. The monitoring confirmed intermittent episodes of elevated heart rate, but no arrhythmia. *Id.* at 982-83. Dr. Welborn opined Richards's intermittent episodes of palpitations with low blood pressure could be consistent with postural orthostatic tachycardia syndrome ("POTS"). She prescribed Florinef, a

corticosteroid used to treat low blood pressure and a beta blocker for intermittent heart palpitations. *Id.* at 980.

Richards returned to the emergency room on June 29, 2005, with symptoms of disorientation and weakness. There were no abnormal findings on physical examination, ECG, hematology laboratory tests, and urinalysis. A chest x-ray showed no acute cardiac or pulmonary disease. *Id.* at 733-34, 739-40, 742, 978.

In August 2005, Richards reported she took a job as a delivery driver for a pharmacy, which required a lot of sitting and standing. *Id.* at 1037. In September she was in the emergency room again, alleging she had lost consciousness while at work and felt chest pain when she regained consciousness. She had a normal ECG and blood tests were normal except for mild anemia. Chest x-rays showed normal heart, lungs, and cervical spine. Hospital personnel were unable to explain the episode. *Id.* at 793-94, 801-03, 805. Extensive follow up testing was also negative. *Id.* at 659-92.

In November 2005, Richards was examined by cardiologist Ranae Ratkovec, M.D. Dr. Ratkovec reviewed Richards's medical history in detail, including emergency room reports and Dr. Welborn's notes. She observed that Richards had at least 9 emergency room visits during 2005 without documented findings of pathology. She opined there was a significant psychosomatic component to Richards's complaints. She ordered a tilt table test and recommended that Richards reduce narcotic use and begin a beta blocker. *Id.* at 973-76

On December 27, 2005, Anthony Garvey, M.D., performed a tilt table test which was mildly abnormal. Richards's heart rate consistently rose with change in position from supine to upright but there was no acute drop in blood pressure. The changes in position caused mild lightheadedness or

dizziness but did not induce syncope. Dr. Garvey prescribed a low dose of Florinef and a beta blocker, the same medications Dr. Welborn had previously prescribed and which Richards had discontinued. *Id.* at 725-26.

In January 2006, Richards saw Dr. Ratkovec for follow up regarding the tilt table test. Richards reported only mild symptoms in the interim. She had experienced some lightheadedness, but otherwise had been fine. She was working and going to graduate school. Dr. Ratkovec observed that extensive monitoring had revealed only sinus tachycardia without arrhythmia. She noted the standard medical therapy would be to use cardiac medications including beta blockers. Richards had already discontinued the medications Dr.Garvey prescribed. Indeed, Dr. Ratkovec did not believe Richards even tried to tolerate them. The only side effect Richards claimed was a vague inability to focus well, even at the lowest possible dose. Dr. Ratkovec gave Richards another medication, but noted "My guess is she will take one-half tablet and say she is too symptomatic as she has with most other attempts at medical therapy." *Id.* at 1068, 973.

In July 2006, Richards was back in the emergency room after a coworker noticed she had a glazed look. She described a "fuzzy" mental status but no actual syncope. She reported she had been working 12 to 14 hours per day recently. She told the attending physician she had diagnoses of dilated cardiomyopathy and POTS but "chooses not to take medications for these as she doesn't feel like they help." *Id.* at 707. Chest x-rays, a hemaotology study and blood chemistry were normal. *Id.* at 721-23. Dr. Garvey restarted Richards on cardiac medications and ordered another ECG, which showed normal left ventricular size with systolic function at the low borderline of normal function. *Id.* at 704-05, 710-12. Dr. Ratkovec read the ECG report and indicated it showed no significant change from previous studies. *Id.* at 1014-15.

In October 2006, Richards returned to the emergency room with chest pain and another near syncopal episode. Her examination and laboratory test results were normal. She again admitted she was not following medication therapy as prescribed. *Id.* at 886-87.

In November 2006, two weeks after the ALJ hearing, Richards presented to the emergency room with chest pain and a headache. The attending physician noted she had been to the emergency room 18 times over the preceding two years, with no significant findings except mild cardiomyopathy and a tilt table test consistent with POTS. Richards had not been taking the beta blocker medication prescribed to treat these conditions. Her physical examination, complete blood count, and metabolic panel were within normal limits. An ECG showed normal sinus rhythm, telemetry monitoring showed no arrhythmia throughout the day, and chest x-rays showed no abnormality. *Id.* at 1071-73, 1085-86.

The ALJ concluded from the foregoing medical evidence that Richards did not have any medically determinable impairment significantly limiting her ability to perform basic work activities. *Id.* at 17. Richards argues the medical findings support diagnoses of fibromyalgia, degenerative disc disease of the lumbar and cervical spine, POTS, and depression.

With respect to fibromyalgia, the medical records reflect that Richards suggested this diagnosis to several examining physicians, including Drs. Lorish, Webster, Lee, and Nishikawa. In April 2003, Richards told Dr. Lorish she had fibromyalgia, but he did not accept this diagnosis. *Id.* at 583-85. In February 2004, Dr. Webster found Richards's presentation lacked credibility and opined there was no evidence of any significant musculoskeletal impairment. *Id.* at 531-35. In May 2004, Dr. Lee made the less than definitive statement that her unexplained pain was "more than likely" fibromyalgia, but this was based on his belief that fibromyalgia had already been diagnosed

in the past and that Richards's family had a history of familial rheumatic disorders. In June 2004, Dr. Nishikawa did not question the diagnosis of fibromyalgia, but found it stable and did not mention any current problem.

Richards relies on Dr. Lee's statement that she had prominent tenderness to palpation at all 18 fibromyalgia tender points. Other providers, including Drs. Anderson and Nishikawa, found generalized tenderness, but no particular point tenderness. The ALJ could reasonably discount the value of Dr. Lee's finding based on the inconsistent findings of other providers, the numerous signs of exaggeration noted throughout the record, and the absence of control point testing to corroborate the tender point testing. In addition, even if the fibromyalgia diagnosis were valid, no physician noted functional limitations from fibromyalgia. At most, Dr. Lee found some subjective range of motion limitations, but Dr. Nishikawa contemporaneously found her ranges of motion within the normal functional range.

Regarding degenerative disc disease of the lumbar and cervical spine, the records reflect that Richard suggested this diagnosis repeatedly to medical providers, claiming to have bulging discs and radicular symptoms. These claims are simply not supported by the objective evidence. Diagnostic images have consistently shown only mild degenerative changes. MRI scans of the lumbar and cervical spine in August 2002 showed one small disc bulge in the lumbar spine which did not compromise the nerve root or spinal canal and no disc bulges in the cervical spine. *Id.* at 966-67. X-rays were consistently unremarkable for any sign of pathology. *Id.* at 612, 688, 694, 805, 835. Clinical tests for radiculopathy, particularly the straight-leg-raise test, yielded inconsistent results with indications of non-organic pain behavior and lack of effort. No medical provider has suggested any functional limitation from the mild degenerative changes.

With respect to POTS, Richards had a mildly abnormal tilt table test that would be consistent with this dysautonomia disorder. *Id.* at 725-26. However, even though she was not taking medications, the tilt table caused only brief lightheadedness with mildly elevated heart rate. Abrupt position changes on the tilt table did not cause a drop in blood pressure or induce fainting. In addition, Richards refused to attempt to tolerate medication for this condition even at the lowest possible dose, without giving any reason that seemed credible to her physicians. The ALJ could reasonably conclude that a person experiencing severe symptoms would attempt to follow the treatment recommendations most likely to alleviate them.

There is also evidence in the record to support periods of mild depression. In June 2002, Dr. Klien prescribed an antidepressant, but Richards soon discontinued it without consulting her. In August 2002, Dr. Losk obtained results consistent with mild depression on the Beck inventory but Richards appeared euthymic and had appropriate affect. Richards continued to refuse antidepressant medications. In February 2004, Dr. Bryan found no indications of depression, but opined Richards might have PTSD symptoms based on a somatoform process. Richards claimed a new onset of depression in February 2006, but did not mention those symptoms again thereafter.

### B.    Subjective Statements

To the extent the medical evidence supports diagnoses of fibromyalgia, degenerative disc disease, POTS, and depression, the ALJ was required to assess the claimant's subjective statements regarding limitations and restrictions that could reasonably be expected to result from those conditions. SSR 96-3p, 1996 WL 374181 *2. An ALJ may discredit a claimant's testimony regarding the severity of symptoms by providing clear and convincing reasons for doing so. *Smolen v. Chater*, 80 F.3d 1973, 1284 (9th Cir 1996); *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993).

The ALJ must make findings that are "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995)

Richards testified that her heart condition and POTS cause blackouts at irregular intervals, which leave her weak and incoherent and unable to remember. She must stay in bed for several days after each event. Admin. R. 1116-18. She would not want to strain her heart by lifting 10 pounds. *Id.* at 1130. She believes her heart goes too fast and skips beats resulting in a type of heart stoppage. *Id.* at 1117. This is contrary to the medical record which shows low normal systolic function and mildly elevated heart rate with changes of position. There is no arrhythmia in the extensive records of heart monitoring or anything that can remotely be construed as heart stoppage or heart failure; only a mildly decreased left ventricle ejection fraction. There is no suggestion in the medical evidence that these conditions could result in memory loss, incoherence or weakness leaving a patient bedridden for several days. Indeed, Richards told Dr. Klein the blackout episodes lasted only two minutes. She did not mention the debilitating weakness described in her testimony to any medical provider. Contrary to her testimony that she must stay in bed for several days after each episode, she admitted going out to play pool after one.

The ALJ did not believe this testimony because of abundant instances of exaggeration in Richards's statements to medical providers, her ability to hold a valid drivers license and maintain employment as a delivery driver while simultaneously engaging in full time graduate studies, and her failure to comply with medications prescribed to treat both cardiomyopathy and POTS without giving any consistent or credible reason. *Id.* at 17-21. When a claimant makes subjective statements about disabling symptoms, but fails to comply with prescribed treatment, an ALJ may reasonably

find the subjective statements unjustified or exaggerated. *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007). It is not credible that Richards would avoid lifting 10 pounds to protect her heart yet refuse to take low dose medications prescribed to treat her heart condition. *Id. See Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001) (Failure to seek and follow treatment despite claims of debilitating symptoms is a sufficient reason to disregard subjective testimony about the symptoms).

Richards testified she has chronic constant pain from bulging discs in her neck and low back, nerve damage, and fibromyalgia. *Id.* at 1120. As a result, she can stand for only 10 to 15 minutes at a time, sit for only 30 minutes, and walk only 2 blocks. *Id.* at 1127-28. The medical evidence supports only early and minimal degenerative changes. There is mention of only one small disc bulge and no evidence of spinal chord or nerve root impingement or nerve damage. The evidence of fibromyalgia is equivocal and inconsistent. It is not reasonable to expect the limitations Richards asserted in her testimony to result from any condition reflected in her medical records. No physician suggested limitations or restricted her activity in a manner consistent with her testimony. Indeed, her physicians consistently urged her to resume normal activities and pursue vocational rehabilitation.

The ALJ did not believe this testimony because the limitations Richards claimed were inconsistent with her ability to work and attend graduate school and engage in robust recreational activities including pool tournaments, parties at the beach, boogie boarding and snorkeling in Hawaii, and attending baseball games in San Diego. It is not credible that Richards is unable to sit more than 30 minutes or stand more than 15 minutes, but able to perform a job that by her description requires a lot of sitting and standing. Yet Richards reported working 12 to 14 hour days at one point. The ALJ could rationally conclude these activities suggested Richards's claims of

constant debilitating pain were not entirely credible. *See Reddick v. Chater,* 157 F.3d 715, 722 (9th Cir. 1998) (ALJ may consider activities inconsistent with the claimant's alleged limitations in determining credibility).

Richards argues her so-called blackout "spells" are consistent with POTS, based on her independent research. Assuming this assertion is theoretically correct, it does not explain her ability to engage in the extensive activities reported or refusal to follow prescribed medical therapy. Accordingly, this argument does not undermine the ALJ's credibility determination.

Richards argues the ALJ incorrectly found she misrepresented losing her drivers license because of blackouts. In fact, she did lose her license for a period in 2003. This argument does not undermine the ALJ's credibility determination because at the time of the hearing, Richards simultaneously had a valid driving license and employment as a driver while claiming to have disabling blackouts. The ALJ could reasonably draw an adverse inference as to credibility from these circumstances.

Richards's remaining challenges to the ALJ's credibility determination may be correct but are insufficient to overcome the valid reasoning already described. That reasoning is clear and convincing and rests on reasonable inferences drawn from the record as a whole. *Smolen,* 80 F.3d at 1284; SSR 96-7p, 1996 WL 374186. The ALJ's findings are sufficiently specific to permit the court to conclude he did not discredit Richards's testimony arbitrarily. Orteza,, 50 F.3d at 748. Accordingly, the ALJ's credibility determination should not be disturbed.

Richards also contends the ALJ improperly rejected her mother's testimony. Richards's mother testified Richards became totally dependent on her family, very fatigued, and socially

inactive after the two motor vehicle accidents. Admin. R. 1136-37. The ALJ's reasons for discrediting Richards's testimony are equally valid with respect to the testimony of her mother.

In summary, substantial evidence supports the ALJ's determination that Richards's combined impairments did not result in functional limitations having significant impact on her ability to perform basic work activities. The medical evidence supports mild stable cardiomyopathy, mild degenerative changes in the spine, mild POTS, and a somatoform disorder. However, there is no credible evidence supporting the functional limitations she claims. Even if the factual record may be interpreted differently, in a manner that supports Richards, the ALJ's findings are supported by a rational interpretation of substantial evidence in the record as a whole and should not be disturbed. *Batson*, 359 F.3d at 1193.

## RECOMMENDATION

Based on the foregoing, the ALJ's findings and conclusion are based on correct legal standards and supported by substantial evidence. The Commissioner's final decision should be AFFIRMED.

DATED this _14_ day of January, 2009.

_____

Thomas M. Coffin
United States Magistrate Judge